UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


PERSEL MERRITT,                      )
                                     )
        Plaintiff,                   )
                                     )    Case No. 4:07CV01961 FRB
                                     )
        v.                           )
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
        Defendant.                   )


**<u>MEMORANDUM AND ORDER</u>**


        This matter is on appeal for review of an adverse ruling by the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

        On December 31, 2001, Persel Merritt ("plaintiff") protectively filed an application for Supplemental Security Income ("SSI") alleging disability due to depression.  (Tr. 116-17.)

        Plaintiff's application was initially denied and, following plaintiff's request, a hearing was held on August 28, 2003 before administrative law judge ("ALJ") James Seiler.  (Tr. 33-41.)  On November 21, 2003, ALJ Seiler issued his decision denying plaintiff's application.  <u>Id.</u>  Plaintiff subsequently petitioned defendant agency's Appeals Council for review, and on

1

April 26, 2004, the Appeals Council remanded plaintiff's case to an ALJ for further consideration. (Tr. 68-71.) A second administrative hearing was held on August 12, 2004 before ALJ James B. Griffith, and on September 29, 2004, ALJ Griffith issued a decision denying plaintiff's application. (Tr. 25-31.) On February 9, 2005, the Appeals Council again remanded plaintiff's case to an ALJ. (Tr. 18-21.) On July 26, 2005, following a third administrative hearing, ALJ Craig Ellis issued a decision denying plaintiff's application, and the Appeals Council denied plaintiff's request for review on April 19, 2006. (Tr. 2-5.)

Plaintiff filed his first Social Security Complaint in this Court on June 16, 2006. (Docket No. 4:06CV00938.) Defendant answered on August 30, 2006, and on November 17, 2006, filed a motion to reverse and remand, averring that the Commissioner's adverse decision failed to properly evaluate the March 2002 opinion of plaintiff's treating psychiatrist, and that the drug abuse analysis was not supported by substantial evidence. Pursuant thereto, the undersigned entered an Order remanding this case to the Appeals Council on November 21, 2006. (Tr. 265-67.) The Appeals Council issued its decision on September 17, 2007, again finding that plaintiff was not under a disability as defined in the Act. (Tr. 253-64.) Plaintiff filed the instant Social Security Complaint on November 21, 2007. (Docket No. 1.)

On January 16, 2009, plaintiff's counsel filed a Suggestion of Death, indicating that plaintiff's mother had advised

that plaintiff died on May 10, 2008.  (Docket No. 16.)

**II.    Evidence Before the Commissioner**

A.    <u>Plaintiff's Testimony</u>

During plaintiff's May 12, 2005 administrative hearing, he was represented by attorney Michael Ferry.  Plaintiff's attorney indicated that it appeared that plaintiff was last seen by a doctor on June 20, 2004, although there was some evidence indicating that plaintiff failed to keep certain appointments.  (Tr. 229.) Plaintiff's attorney stated that he believed plaintiff had not had medical treatment following that date, and plaintiff confirmed this.  <u>Id.</u>

Plaintiff was first questioned by the ALJ.  He testified that he was born on September 21, 1960, and was forty-four years of age.  (Tr. 230.)  Plaintiff testified that he was single, and that he had, for the past five or six years, lived in a rented house with his mother, Catherine Merritt, who was retired and who supported him.  (Tr. 230-31; 233-34.)  Plaintiff completed the eleventh grade of high school, and obtained his GED.  (Tr. 231-32.) He was five feet, seven and one-half inches tall, and weighed 145 pounds.  (Tr. 232.)  He never served in the military.  <u>Id.</u>  He testified that, 20 years prior, he was imprisoned for two years and spent one year in a halfway house for "first degree attempt burglary."  <u>Id.</u>  He was not currently on probation or parole.  <u>Id.</u>

Plaintiff testified that, about six years ago, he spent nine months working as a dockworker for a Sears store.  (Tr. 234-

3

35.)  Plaintiff has not worked since.  (Tr. 235.)  Plaintiff testified that he was awaiting the results of a recent Medicaid application so that he could resume seeing a doctor and taking his medication.  Id.

The ALJ asked plaintiff if he had been on Medicaid when he was going to BJC Behavioral Health, and plaintiff replied that he had not.  Id.  Plaintiff explained that BJC had been seeing him for free, but discharged him from care because he missed appointments.  (Tr. 236.)  Plaintiff explained that he had trouble arranging transportation.  Id.  Plaintiff testified that he had been referred to BJC through a Methadone[1] clinic, and that he used to take the bus to get there.  (Tr. 236-37.)  Plaintiff testified that he had to stop taking the bus because he was "getting into altercations with people" every time he got on the bus.  (Tr. 237.)  Plaintiff testified that he did not have a driver's license, and that a friend had driven him to the hearing that day.  Id.

When asked about his daily activities, plaintiff testified "I spend all my time in my little room every day."  Id.  The ALJ asked plaintiff whether he went to the Methadone clinic

---

[1]Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. It also is used to prevent withdrawal symptoms in patients who were addicted to opiate drugs and are enrolled in treatment programs in order to stop taking or continue not taking the drugs. Methadone is in a class of medications called opiate (narcotic) analgesics. Methadone works to treat pain by changing the way the brain and nervous system respond to pain. It also works as a substitute for opiate drugs of abuse by producing similar effects and preventing withdrawal symptoms in people who have stopped using these drugs.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html

every day, and plaintiff replied "[w]ell besides going to the Methadone clinic, I'm back at my house in my room." Id. Plaintiff testified that his friend and sister had been providing transportation to the Methadone clinic. (Tr. 237-38.) Plaintiff testified that he could not have arranged this transportation to BJC because his sister was not living with him and his mother at that time, and his friend had worked different hours. (Tr. 238.) Plaintiff testified that the drive to the Methadone clinic takes 12 minutes and he spends three minutes there, and takes the Methadone in a liquid form. Id.

Plaintiff testified that he smokes about two cigarettes per day, and that his sister gives them to him. (Tr. 239.) Plaintiff denied drinking alcohol. Id. Plaintiff testified that he had not taken street drugs since entering the Methadone program. Id. He testified that, with the exception of the sister who lived with him and provided him transportation, he did not get along with his other siblings. (Tr. 240.) Plaintiff testified that his family described him as being very solitary. Id.

Plaintiff then responded to questions from his attorney. He testified that he could not work because he was "just so down and depressed," and stated that it would be hard for him to be around people. (Tr. 241.) Plaintiff stated that he was taking no psychiatric medications. Id. He stated that he usually rose for the day around noon and began getting ready to go to the clinic. (Tr. 242.) Plaintiff testified that, when he returned home from

the clinic, he went into his room, closed the door, and remained there for the rest of the day. Id. Plaintiff testified that he did not help with cooking, grocery shopping, housework, dishes, yard work, or any other household duties. Id. He stated that he was not lazy, he just had no will to do anything. Id. Plaintiff testified that he had no hobbies, and that the Methadone clinic was the only place he went. (Tr. 243.)

The ALJ then heard testimony from Stephen Dolan, a vocational expert ("VE"). The ALJ posed five hypotheticals to the VE, all of which involved a hypothetical individual of plaintiff's age, education and work experience with no exertional limitations. (Tr. 244-47.) For his first hypothetical, the ALJ asked Mr. Dolan to assume an individual with marked limitations in the following areas: the ability to behave in an emotionally stable manner; maintain reliability; maintain regular attendance and be punctual; make simple work related decisions or accept instruction; and respond to criticism. (Tr. 244.) For his second hypothetical, the ALJ asked Mr. Dolan to assume an individual with a marked inability to complete a normal work day and work week without interruption from symptoms, and perform at a consistent pace without any unreasonable number and length of rest periods; and moderate limitations in the following areas: the ability to sustain an ordinary routine without special supervision; maintain attention and concentration for extended periods; cope with normal work stress; and behave in an emotionally stable manner. (Tr. 245.)

Regarding both of these hypotheticals, Mr. Dolan testified that such a person would be unable perform work activity because there were too many marked emotional problems. (Tr. 245-46.)

For his third hypothetical, the ALJ specified an individual who was restricted to no more than occasional contact with the public, and to simple work activity that did not entail fast-paced or strict production. (Tr. 246.) For his fourth hypothetical, the ALJ specified a person with an inability to work with the public. Id. For his fifth hypothetical, the ALJ specified a person with moderate limitations in the following areas: the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; respond appropriately to changes in the work setting; interact appropriately with the public; and complete a normal work day and work week without interruption from psychologically based symptoms. (Tr. 246-47.)

Mr. Dolan testified that a person meeting the specifications of hypothetical number three would be able to work as a dishwasher, dining room attendant, and housekeeping cleaner. (Tr. 247.) Regarding hypothetical number four, Mr. Dolan testified that such a person could work as an unskilled assembler, hand packager, or cleaner. (Tr. 248.) Regarding the fifth hypothetical, Mr. Dolan testified that such a person could do simple routine jobs such as dishwashing and some cleaning

7

positions.  (Tr. 248-49.)

B.    <u>Medical Records</u>

Records from Barnes-Jewish Behavioral Health Clinic ("BJC") indicate that plaintiff was seen by Anne Radetic-Murphy, MSW, LCSW, on December 19, 2001 for an initial assessment.  (Tr. 191-96.)  Plaintiff reported experiencing a low mood, low motivation, sleep disturbances and suicidal ideations for the past 15 years.  (Tr. 191.)  He reported a long history of heroin use, and also reported having sold drugs, and being shot while doing so. (Tr. 191-92.)  He indicated his goal of decreasing his depression and suicidal ideations, and to increase restful sleep and live and work independently.  (Tr. 191.)

Plaintiff gave a history of selling drugs and making a lot of money at a young age, and stated that he began getting depressed after he stopped selling drugs and lost his housing and his girlfriend, and was broke.  (Tr. 192.)

It was noted that plaintiff was bothered by feelings of hopelessness, thoughts of suicide, urges to beat or harm someone, temper outbursts, urges to break or smash things, threatening to harm others, hearing voices, seeing visions, being controlled by outside forces, trouble falling asleep, early morning awakening, and restless/disturbed sleep.  (Tr. 192-93.)  It was noted that, per M. Qaisrani, M.D., on December 24, 2001, plaintiff's diagnoses

were major depression with psychotic features/rule out Dysthymia;[2] and personality disorder. (Tr. 193.) It was noted that plaintiff's last use of marijuana was not clear, and that he had last used heroin one week prior to this date. (Tr. 195.)

On January 22, 2002, plaintiff saw Dr. Qaisrani at BJC for a treatment session. (Tr. 190.) Plaintiff reported having run out of medication, and complained of some anxiety. Id. Plaintiff was given Fluoxetine,[3] Vistaril,[4] and Zyprexa.[5] Id.

Dr. Qaisrani's notes indicate that plaintiff did not appear for his scheduled appointment on February 19, 2002. Id.

A February 21, 2002 note from Ms. Radetic-Murphy indicates that attempts were made to contact plaintiff, but his telephone number had been disconnected. (Tr. 200.) Ms. Radetic-Murphy wrote that, during plaintiff's next visit, he would be assigned to a caseworker so that he could receive long-term care.

---

[2]Dysthymia is a mood disorder characterized by a chronic mildly depressed or irritable mood. It is often accompanied by other symptoms such as eating and sleeping disturbances, fatigue, and poor self-esteem. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=dysthymia

[3]Fluoxetine, also called Prozac, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[4]Vistaril, or Hydroxyzine, is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety, and to treat the symptoms of alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html

[5]Zyprexa, or Olanzapine, is used to treat symptoms of schizophrenia and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601213.html

Id.  Ms. Radetic-Murphy wrote that plaintiff was to call if he needed a cab to provide transportation.  Id.  She advised him of his next appointment date and time.  Id.

Plaintiff returned to Dr. Qaisrani on March 5, 2002 with complaints of nightmares and "passive death wishes."  (Tr. 190.) Plaintiff was continued on Fluoxetine and Zyprexa, and also given Trazodone.[6]  Id.

On March 19, 2002, Dr. Qaisrani completed a Mental Medical Source Statement ("MSS").  (Tr. 182-85.)  He assessed marked limitations in some areas of activities of daily living, social functioning; and concentration, persistence or pace.  (Tr. 182-83.)  Dr. Qaisrani opined that plaintiff had suffered "one or two" episodes of decompensation in the past year. (Tr. 184.)  Dr. Qaisrani opined that plaintiff had a substantial loss of the ability to understand, remember and carry out simple instructions; make judgments commensurate with unskilled work; respond appropriately to supervisors and others; and deal with changes in a work setting.  Id.  Dr. Qaisrani indicated plaintiff's diagnosis as major depressive disorder with psychotic features, and personality disorder.  (Tr. 185.)  He assessed a GAF of 55, and stated that plaintiff's lowest GAF in the past year had been 50. Id.

On May 14, 2002, Stacey L. Smith, M.D., completed a

---

[6]Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

Disability Evaluation of plaintiff. (Tr. 177-80.) Dr. Smith indicated that plaintiff had been driven to the interview by a friend. (Tr. 177.) Plaintiff indicated that he completed the tenth grade and had a GED. Id. He reported a history of severe conduct disorder, stating that he was suspended "thousands of times" for truancy and fighting, and that he also ran away from home at an early age. Id. Plaintiff also had a history of being homeless. Id.

Plaintiff reported that he had "no job history," but upon questioning stated that he had worked briefly at a Hardees restaurant and "two or three times" for a temporary service. (Tr. 177.) Plaintiff reported that he had "depression with suicidal tendencies." Id. He reported one psychiatric admission to Malcolm Bliss for three months in 1991, stating that he had been depressed and had cut his wrists. Id. Plaintiff reported that he had no psychiatric follow-up after that admission until six months ago when he sought care at Barnes-Jewish Clinic. (Tr. 176.) He reported that medications he took yielded no positive changes. Id. Plaintiff reported that, when depressed, he had social withdrawal,, poor appetite, disturbed sleep, body pains, and headaches. Id. He reported that he has "always been a loner" but that this was more pronounced when he was depressed. Id. Plaintiff reported that he had been that way "all his life." (Tr. 176.)

Dr. Smith noted a substantial substance abuse history, noting that plaintiff had used cocaine and PCP regularly for 15

years, and that this caused financial, family, job, and mood problems. _Id._ Plaintiff reported having been "clean for two years." _Id._ Plaintiff reported that he had been shot on three occasions, once in the head in 1991, and twice in the hands. _Id._

Plaintiff reported that he spent 24 hours per day in his room, that he did not like to be around other people, and that he did nothing to help his mother. (Tr. 176.) Plaintiff reported having one long-time friend of 28 years. _Id._

Upon exam, Dr. Smith noted that plaintiff appeared healthy, and had a neat, clean appearance. _Id._ Plaintiff's speech, psychomotor activity and flow of thought were normal. _Id._ His mood was depressed, and his affect was neutral with smiling and chuckling through the sensorium exam. (Tr. 179.) Plaintiff was not irritable, and was not suicidal, homicidal or psychotic. _Id._ Plaintiff was fully oriented; his insight was fair; and his intellect was low-average. _Id._

Dr. Smith's impression was depressive disorder not otherwise specified; cocaine dependence and PCP abuse, reportedly in remission. _Id._ Dr. Smith also assessed an antisocial personality disorder, and assigned a Global Assessment of Functioning ("GAF") of 65. (Tr. 179.) Dr. Smith wrote that plaintiff had only recently begun treatment and that more aggressive therapies were available to treat his depression, and opined that plaintiff's major problem was antisocial personality disorder. _Id._ Dr. Smith opined that plaintiff appeared capable of

simple, repetitive tasks under supervision.  <u>Id.</u>  She opined that plaintiff appeared capable of managing benefits should they be awarded, but because of plaintiff's history of drug abuse, recommended a payee.  <u>Id.</u>

On May 21, 2002, plaintiff saw Dr. Qaisrani and complained of decreased sleep and appetite. (Tr. 209.)  He denied suicidal or homicidal ideation.  <u>Id.</u>  His medications were continued.  <u>Id.</u>

Plaintiff did not keep his May 28, 2002 appointment. <u>Id.</u>

On June 18, 2002, plaintiff saw Dr. Qaisrani and complained of decreased sleep and depressed mood.  (Tr. 208-09.) He stated that he had run out of medication.  <u>Id.</u>  His medications were restarted, and he was given Remeron.[7]  <u>Id.</u>  He was assessed with major depressive disorder.  (Tr. 208.)

On July 3, 2002, Sherry Bassi, Ph.D. completed a Mental Residual Functional Capacity Assessment. (Tr. 136-38.)  Dr. Bassi found moderate limitations in the following areas: the ability to carry out detailed instructions and maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual; the ability to complete a normal work day and work week without interruption from psychologically-based symptoms; the

_____

[7]Remeron, or Mirtazapine, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697009.html

ability to interact appropriately with the general public; and the ability to respond appropriately to changes in a work setting. (Tr. 136-37.) Dr. Bassi wrote that plaintiff could follow simple directions and make basic work-related decisions. (Tr. 138.) She wrote that plaintiff could relate adequately to peers and supervisors, and could adapt to routine changes in a work environment. Id.

On July 30, 2002, plaintiff saw Dr. Qaisrani for a treatment session, and discussed his day-to-day life. (Tr. 208.) He felt that his medications were working, and they were continued. Id.

On October 28, 2002, plaintiff saw BJC physician Mehmet E. Dokucu, M.D. (Tr. 206-07; 212-14.) Plaintiff's chief complaint was "I am still depressed." (Tr. 206, 212.) Dr. Dokucu noted no suicidal ideation, but found plaintiff had a depressed mood. (Tr. 206, 213.) Dr. Dokucu noted that plaintiff had not taken medication in the past three weeks, and that this had caused his symptoms to worsen. (Tr. 206, 212.) Dr. Dokucu noted that plaintiff was dressed in a gray sweat suit and was cooperative. (Tr. 207.)

Dr. Dokucu noted that plaintiff reported being drug and alcohol free for more than two years. (Tr. 212.) He noted that plaintiff had not seen his psychiatrist for a while due to transportation and scheduling problems. Id. Plaintiff reported hearing a voice telling him to hurt himself, but acknowledged that

14

this might be his own thoughts.  <u>Id.</u>  Plaintiff did not believe that this was another person talking to him; stated he was able to ignore it; and denied any other voices.  <u>Id.</u> Plaintiff was "negativistic" about his life. (Tr. 213.)  Dr. Dokucu noted a long history of truancy, legal problems, assaults, and other events which appeared to fulfill the criteria for Antisocial Personality Disorder.  <u>Id.</u>

Dr. Dokucu noted that plaintiff appeared aloof and that his clothing was not very clean, but that he fair hygiene.  <u>Id.</u>  He made poor eye contact and moved slowly.  <u>Id.</u>  Dr. Dokucu noted that plaintiff could smile properly if elicited.  (Tr. 213.)  His insight and judgment were good, his sensorium and intellect were intact, and he was alert and oriented.  (Tr. 213-14.)

Dr. Dokucu diagnosed plaintiff with major depressive disorder/rule out Dysthymic disorder; opiate dependence; and a history of PCP dependence.  <u>Id.</u>  He assigned a GAF of 60 to 65. (Tr. 214.)  He was prescribed Prozac and Trazodone.  <u>Id.</u>

On November 25, 2002, plaintiff failed to keep an appointment with Dr. Dokucu.  (Tr. 204.)

Plaintiff saw Dr. Dokucu on December 9, 2002, and stated that he could only see the doctor for 10-15 minutes because he had to be in court by 9:30.  <u>Id.</u>  Plaintiff reported little improvement of his symptoms, and denied current illicit substance use.  <u>Id.</u> Dr. Dokucu diagnosed major depressive disorder versus Dysthymic disorder, and increased plaintiff's Prozac and Trazodone dosages.

Id.

On December 30, 2002, plaintiff failed to keep his appointment with Dr. Dokucu. (Tr. 204.)

The BJC records include a January 15, 2003 Annual Assessment Addendum/Treatment Plan. (Tr. 210-11.) It is indicated that plaintiff lived in a home with his mother and sister in a nice neighborhood right off of a bus line. Id. It is indicated that plaintiff was not interested in pursuing any employment. Id. He stated that he got along with his family, but had no friends. Id. Although he was aware of welfare and food stamps, he stated no plan to apply. (Tr. 211.) He stated that he believed he had warrants out for his arrest due to traffic stops, and that he owed $2,000.00 to four or five municipalities for driving with a suspended license. Id. Plaintiff stated that he did not drive now because he was afraid he would go to jail if pulled over by police. Id. The Assessment then notes: "[t]his is also a factor in his staying in the house all the time." Id.

On January 20, 2003, plaintiff saw Dr. Dokucu and it was noted that he had missed his last appointment due to transportation problems, and that he would discuss options with his case manager. Id. Plaintiff reported being off of his medications for one week, and that his sleep was worse. Id. Plaintiff reported that his symptoms had not responded significantly to Prozac, and asked whether other medication was going to work. (Tr. 204-05.) He denied alcohol and drug use. (Tr. 205.) Dr. Dokucu noted that

16

plaintiff appeared dysthymic and was somewhat sarcastic, and was demanding and entitled. Id. He had no suicidal or homicidal intent. Id.

Dr. Dokucu assessed Dysthymic disorder, rule out major depressive disorder; and opiate dependence, currently in partial remission with treatment. Id. Dr. Dokucu noted that he encouraged plaintiff to go to Narcotics Anonymous meetings and to find a sponsor in addition to the counseling at the Methadone center, and also encouraged plaintiff to do outside volunteering, exercise (including walking), and vocational rehabilitation. (Tr. 205.)

On February 5, 2003, plaintiff's BJC case manager interviewed plaintiff, and it was noted that plaintiff should continue to see Dr. Dokucu and take all medications as prescribed. (Tr. 210.)

On February 19, 2003, plaintiff failed to keep his appointment with Dr. Dokucu. (Tr. 203.)

On March 19, 2003, plaintiff saw Dr. Dokucu and stated that he had run out of medications, but had used an extra bottle he had from the past. Id. He reported that his appetite, energy, sleep and depression had all partially improved on Prozac. Id. He denied suicidal or homicidal intent. Id. He was cooperative, but appeared dysphoric. (Tr. 203.) Dr. Dokucu assessed major depressive disorder versus Dysthymic disorder, and opiate dependence, increased plaintiff's Prozac dosage, and started

17

plaintiff on Klonopin.[8]  Id.

Plaintiff did not keep his April 21,2003 appointment with Dr. Dokucu.  Id.

Plaintiff returned on May 28, 2003 and stated that he had run out of his medication.  (Tr. 202.)  He reported that his depression had worsened, but had no suicidal or homicidal intent. Id.  Dr. Dokucu assessed opiate dependence and Dysthymic disorder versus major depressive disorder, and re-started plaintiff's Prozac and Klonopin.  Id.

Plaintiff failed to keep his June 30, 2003 appointment. Id.

On July 21, 2003, plaintiff saw Dr. Dokucu and stated that he had been taking Prozac, but had noticed no decrease in symptoms.  (Tr. 202.)  He was refusing to start personally meaningful activities.  Id.  He denied suicidal or homicidal intent, and denied heroin use.  Id.  He stated that his mood was "ok I guess."  Id.  Dr. Dokucu diagnosed opiate dependence and Dysthymic disorder with a history of major depressive disorder. (Tr. 202.)

Plaintiff did not keep a September 22, 2003 appointment with Dr. Dokucu.  (Tr. 220.)

On October 27, 2003, plaintiff was seen by Dr. Dokucu and

_____

[8]Klonopin, or Clonazepam, is used to control seizures. It is also used to control anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

reported that his mother had passed away from a heart attack, and his sister had died from a stroke.[9]  Id.  Plaintiff had not been taking his medication for two months.  Id.  He reported suicidal ideation but no plan, and stated that he continued to go to the Methadone clinic.  Id.  He was assessed with Dysthymic disorder with a history of major depressive disorder, and opiate dependence. (Tr. 220.)  His medications were restarted.  Id.

Dr. Dokucu completed a MSS on October 27, 2003.  (Tr. 215-18.)  He opined that plaintiff had moderate limitations in some areas of activities of daily living and social functioning.  (Tr. 215-16.)  He opined that plaintiff had marked limitations in the areas of completing a normal work day and work week without interruptions from symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 216.)  He opined that plaintiff had no episodes of decompensation during the last year, and opined that plaintiff had a substantial loss of the ability to respond appropriately to supervision; and deal with changes in a work setting.  (Tr. 217.)  He assessed a GAF of 60.  (Tr. 218.)

Plaintiff did not keep his December 1, 2003 appointment, or his February 5, 2004 appointment.  (Tr. 220.)

Plaintiff returned to BJC on June 28, 2004, and it was

---

[9]During his administrative hearing on May 12, 2005, plaintiff testified that he lived with his mother and sister, and that his mother, who was 64 years of age and retired, supported him.  (Tr. 230-31; 233-34.)

noted that he had been absent for eight months.  Id.  He reported that he had been in Mississippi for four to five months "for a change."  Id.  He reported that he had stayed on Methadone during this time, but had discontinued his psychiatric medications.  Id. Plaintiff stated that he was feeling worse without the medications, and had decided to see the doctor.  (Tr. 220.)  He had no suicidal or homicidal ideation.  Id.  He was diagnosed with Dysthymic disorder and a history of major depressive disorder, and opiate dependence.  Id.  His Prozac and Klonopin were restarted.  Id.

The BJC records indicate that plaintiff did not keep the following appointments: August 23, 2004; September 27, 2004; and December 13, 2004.  (Tr. 222.)

III.     **Administrative Decisions**

A.    The ALJ's Decision

ALJ Ellis found that plaintiff had not engaged in substantial gainful activity since at least the year 2000.  The ALJ found that the medical evidence established that plaintiff had "opiate dependence (methadone/heroin), a dysthymic disorder and a personality disorder," but that he did not have an impairment or combination of impairments of listing-level severity.  (Tr. 15.)

The ALJ discredited plaintiff's allegations of disabling symptoms precluding all substantial gainful activity.  In so doing, the ALJ cited Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and considered the appropriate factors therefrom, and cited

20

numerous inconsistencies in the record detracting from plaintiff's credibility.[10]  Regarding plaintiff's testimony that he had not used heroin while undergoing Methadone replacement therapy, however, the ALJ noted that, in December 2001, plaintiff reported that he had been in a Methadone treatment program for one and one-half years. The ALJ also wrote:

> A social worker at Community Health Plus indicated in December 2001 that a barrier to the claimant experiencing a decrease in adverse psychological symptoms, and therefore being able to work, was his use of heroin. Her treatment notes show that the claimant was using heroin while in a methadone maintenance program!  This strongly suggests that the claimant's primary impairment has been his opiate dependence.  It also refutes the claimant's testimony that he has not used heroin since he was in the methadone program.

(Tr. 13.)

The ALJ found that plaintiff had no past relevant work. The ALJ then wrote "[b]ut for opiate dependence, the claimant has the residual functional capacity to perform a wide range of work at all exertional levels."  (Tr. 15.)  The ALJ concluded that plaintiff was "not disabled but for opiate dependence."  Id.  The ALJ noted the VE's testimony that there were a significant number of jobs that a hypothetical individual with plaintiff's vocational factors and residual functional capacity could perform, and concluded that plaintiff was not under a disability as defined in

---

[10]Plaintiff herein makes no challenges regarding the Commissioner's credibility determination.

the Act.

Following this Court's order of remand, the Appeals Council issued a new decision, dated September 17, 2007. (Tr. 256-61.) The Appeals Council noted that plaintiff had opiate dependence (heroin), a dysthymic disorder, and personality disorder, and noted that the ALJ had found that plaintiff's impairments were severe, at least in combination. (Tr. 257.)

The Appeals Council thoroughly reviewed and discussed the medical and other evidence of record. (Tr. 257-59.) The Appeals Council noted Dr. Qaisrani's opinion on his checklist that plaintiff had marked limitations in functioning in several aspects of social functioning and concentration. The Appeals Council analyzed Dr. Qaisrani's opinion in conjunction with his own treatment records and the balance of the medical evidence in the record. The Appeals Council concluded that Dr. Qaisrani's opinion was inconsistent with his own treatment notes, in which he observed that plaintiff was alert and well oriented; had goal-directed thought processes, and normal speech. The Appeals Council also noted that Dr. Qaisrani's opinion was inconsistent with the opinion of Dr. Dokucu, a treating psychiatrist, who found that plaintiff had only moderate global symptoms, and was able to cooperate and even laugh during examination. The Appeals Council also found Dr. Qaisrani's opinion inconsistent with that of Dr. Smith, who indicated that plaintiff had only mild psychiatric symptoms and no

22

signs of psychotic disorder, had a smiling and chuckling affect, and was capable of working and performing simple repetitive tasks.

The Appeals Council concluded that Dr. Qaisrani's opinion was entitled to only little weight because it was inconsistent with his own treatment notes and with the record as a whole. The Appeals Council noted that it was affording greater weight to the findings of Drs. Dokucu and Smith.

The Appeals Council also noted that plaintiff's noncompliance with treatment directives detracted from his credibility. The Appeals Council then wrote:

> The medical evidence does not establish the existence of any other persistent, significant, and adverse physical limitation of function due to any other ailment, but for opiate dependence. The claimant is able to perform a wide range of work at all exertional levels absent opiate drug use. The claimant's opiate dependence is material to any determination that he is disabled. Therefore, the claimant is not under a disability, as defined in the Social Security Act and Regulations, as amended by Public Law 104.121.

(Tr. 259.)

The Appeals Council then wrote "[b]ut for opiate dependence, the claimant has the residual functional capacity to perform work except for work that involves contact with the public." (Tr. 260.)

IV.    **Discussion**

To be eligible for supplemental security income under the

Social Security Act, a plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health and Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A) (defining "disability" for DIB and SSI purposes). The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity.

If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v.

<u>Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health and Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir.

1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the Commissioner erred in failing to give controlling, or at least great, weight to the opinions of Drs. Qaisrani and Dokucu, each of whom checked boxes on MSS checklists indicating that plaintiff had varying areas of marked limitation. Plaintiff also argues that the Appeals Council erred in concluding that plaintiff's "opiate dependence" was material to a determination that plaintiff was disabled.

In response, the Commissioner contends that the medical opinion evidence was properly considered. The Commissioner further contends that the medical evidence establishes that plaintiff was opiate-dependent, and alternately contends that the Appeals Council properly determined that plaintiff's noncompliance with medical treatment was material to the disability determination.

Having reviewed the entire record, the undersigned has determined that substantial evidence supports the Commissioner's treatment of the medical opinion evidence. However, it cannot be said that substantial evidence supports the Appeals Council's decision that plaintiff's "opiate dependence" materially contributed to his disability, and remand is therefore necessary.

A.   Medical Opinion Evidence

The opinion of a treating physician is given special deference under the Social Security Regulations. The Regulations provide that a treating physician's opinion regarding an

applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(d)(2). Consistent with the Regulations, the Eighth Circuit has stated that a treating physician's opinion is "normally entitled to great weight," Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999), but has also cautioned that such an opinion is not automatically entitled to controlling weight, because the Commissioner must evaluate the record as a whole. Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).

A treating physician's checkmarks on an MSS or RFC checklist are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). The Eighth Circuit has also upheld an ALJ's decision to discount, or even disregard, the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of the opinion at issue, See Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

The record includes the March 19, 2002 MSS checklist of Dr. Qaisrani, which was addressed by the Appeals Council as was

instructed in this Court's November 21, 2006 Order. The record also includes the October 27, 2003 MSS checklist of Dr. Dokucu, which had been addressed by ALJ Ellis in his July 26, 2005 opinion.

### 1. Dr. Qaisrani's MSS Checklist

Dr. Qaisrani completed a MSS checklist, on which he checked boxes indicating that plaintiff had "marked" limitations in many areas, including activities of daily living, social functioning, and maintaining concentration, persistence or pace. The Appeals Council wrote that it decided to give Dr. Qaisrani's opinion little weight because it was inconsistent with both his own treatment notes, and with the other medical evidence in the record.

In so finding, the Appeals Council noted that Dr. Qaisrani's opinion was inconsistent with his own treatment notes, in which he found plaintiff to be alert and well-oriented, and to have goal-directed thought processes and normal speech. The Appeals Council also noted that Dr. Qaisrani's opinion was inconsistent with Dr. Dokucu's records. The Appeals Council noted that Dr. Dokucu found that plaintiff had only moderate global symptoms, and his treatment notes indicated little change in plaintiff's symptoms, and noted that plaintiff was able to laugh during examination. The Appeals Council also noted that Dr. Qaisrani's opinion was inconsistent with Dr. Smith's opinion that plaintiff had only mild psychiatric symptoms, no sign of a psychotic disorder, a smiling and chuckling affect, and was capable

of working and completing simple, repetitive tasks. These are good reasons for assigning little weight to the opinion. <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 632-33 (8th Cir. 2008) (ALJ properly rejected the assessment of a treating physician after finding it was inconsistent with the treating physician's own treatment notes, objective testing, and other medical evidence in the record); <u>see also</u> <u>Bentley</u>, 52 F.3d at 786 (treating physician's opinion is not entitled to controlling weight when "the treating physician evidence is itself inconsistent.")

The Appeals Council also noted that plaintiff's noncompliance with treatment detracted from his credibility. Indeed, this record contains numerous references to plaintiff missing appointments, and failing to take his medication as prescribed. A claimant's failure to comply with treatment is properly considered when weighing a treating physician's opinion. <u>Owen v. Astrue</u>, 551 F.3d 792, 800 (8th Cir. 2008) ("a claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight.")

In addition, the undersigned notes that Dr. Qaisrani rendered this opinion via a MSS checklist. A treating physician's checkmarks on an MSS or RFC checklist are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See <u>Stormo</u>, 377 F.3d at 805-06; <u>Hogan</u>, 239

F.3d at 961.

Having reviewed the record, the undersigned determines that the Appeals Council properly considered Dr. Qaisrani's opinion and gave good reasons for its decision to give it little weight. Substantial evidence supports this decision.

## 2. Dr. Dokucu's MSS Checklist

Dr. Dokucu also completed a MSS checklist, on which he checked boxes indicating that plaintiff had "marked" limitations in the areas of completing a normal work day and work week without interruptions from symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. While the Appeals Council did not directly address this MSS opinion, focusing instead, as directed, on Dr. Qaisrani's MSS opinion, it did adopt the ALJ's findings and conclusions, in which the ALJ addressed Dr. Dokucu's MSS opinion. The Appeals Council also discussed Dr. Dokucu's treatment records.

ALJ Ellis thoroughly analyzed Dr. Dokucu's records and noted the opinion he expressed in his MSS checklist. ALJ Ellis noted that Dr. Dokucu's records contained frequent references to the fact that plaintiff was not compliant with his medication regimen and treatment recommendations; that he skipped numerous appointments; and that Dr. Dokucu ultimately discharged plaintiff from care due to his noncompliance. Owen, 551 F.3d at 800 ("a claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and,

31

therefore, can be considered in determining whether to give that opinion controlling weight.") ALJ Ellis also observed that plaintiff reported that he had moved to and lived in Mississippi for four to five months, noting that doing so required both mental and financial resources inconsistent with such marked limitations.

Furthermore, at the same time Dr. Dokucu indicated that plaintiff had two areas of "marked" limitation, he assessed plaintiff with a GAF of 60, consistent with his earlier assessment of plaintiff as having a GAF of 60-65. These GAF scores are inconsistent with "marked" limitations, and they support the decision to deny controlling weight to Dr. Dokucu's MSS opinion. See Bentley, 52 F.3d at 786 (treating physician's opinion is not entitled to controlling weight when "the treating physician evidence is itself inconsistent.")

During the Appeals Council's discussion of Dr. Dokucu's treatment records, the Appeals Council noted that plaintiff was frequently noncompliant with treatment, and that Dr. Dokucu found him to be alert and well-oriented. The Appeals Council noted that plaintiff obtained perfect scores in mini tests of concentration and memory, and that Dr. Dokucu had diagnosed merely a Dysthymic disorder and assigned plaintiff GAF scores consistent with only mild to moderate global symptoms. A treating physician's opinion is not entitled to controlling weight when it is inconsistent with his or her own treatment records. Bentley, 52 F.3d at 786. Furthermore, the opinion in question was rendered via a MSS checklist. A treating physician's checkmarks on an MSS or RFC

checklist are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Stormo, 377 F.3d at 805-06; Hogan, 239 F.3d at 961.

Plaintiff also briefly notes that the Appeals Council did not say what weight it was giving to the opinions of either Dr. Dokucu or Smith. The undersigned disagrees. The Appeals Council specifically wrote that it was giving greater weight to Dr. Dokucu's findings that plaintiff had only moderate global symptoms, and Dr. Smith's opinion that plaintiff had only mild psychiatric symptoms.

Review of the record reveals that the Commissioner properly evaluated the medical opinions of Drs. Qaisrani and Dokucu. For the reasons stated herein, substantial evidence on the record as a whole supports the Commissioner's conclusion to deny controlling or great weight to the opinions of Drs. Qaisrani and Dokucu.

B.     Materiality of Plaintiff's Opiate Dependence/Drug Use

The Appeals Council determined that plaintiff's "opiate dependence" was material to the determination that he was disabled. (Tr. 259.) The Appeals Council determined that plaintiff was "able to perform a wide range of work at all exertional levels absent opiate drug use," and concluded that plaintiff was therefore not under a disability as defined in the Act. Id. As plaintiff contends, this finding is not supported by substantial evidence on the record as a whole.

Even if the Commissioner determines that a claimant is

33

disabled, the claimant may not obtain SSI benefits if either alcoholism or drug addiction is found to be a contributing factor material to that determination. <u>Pettit v. Apfel</u>, 218 F.3d 901, 903 (8th Cir. 2000) (citing 42 U.S.C. § 1382c(a)(3)(J)). The "key factor" in determining the materiality of drug addiction or alcoholism is whether the Commissioner would still find the claimant disabled if he stopped using drugs or alcohol. 20 C.F.R. § 416.935(b); <u>see</u> <u>also</u> <u>Pettit</u>, 218 F.3d at 903. In making this determination, the Commissioner evaluates which of the claimant's current physical and mental limitations would remain if the claimant stopped using drugs or alcohol, and then determines whether any or all of those remaining limitations would be disabling. 20 C.F.R. § 416.935(b)(2) <u>see</u> <u>also</u> <u>Pettit</u>, 218 F.3d at 903 ("The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause.") Determining whether a claimant would remain disabled if he stopped using drugs "is simpler if the claimant actually has stopped." <u>Pettit</u>, 218 F.3d at 903.

In the case at bar, plaintiff's doctors repeatedly diagnosed him with "opiate dependence," and the record also documents that plaintiff consistently used Methadone to control the symptoms of heroin addiction. In addition, the record contains one social worker's note, dated December 19, 2001, indicating that plaintiff reported using heroin the preceding week, a date which

predated plaintiff's protective filing date. While this does contradict plaintiff's testimony that he did not use street drugs following his entry into the Methadone treatment program, the record is void of evidence subsequent to this reference indicating that plaintiff continued to use heroin, or was suspected of using it.

In its decision, the Appeals Council noted that it adopted ALJ Ellis' findings and conclusions regarding whether plaintiff was disabled, and noted that ALJ Ellis had found that plaintiff had severe impairments, but that none were of listing-level severity, either alone or in combination. Following an analysis of the evidence, the Appeals Council wrote:

> The medical evidence does not establish the existence of any other persistent, significant, and adverse physical limitation of function due to any other ailment, but for *opiate dependence*. The claimant is able to perform a wide range of work at all exertional levels absent *opiate drug use*. The claimant's *opiate dependence* is material to any determination that he is disabled. Therefore, the claimant is not under a disability, as defined in the Social Security Act and Regulations, as amended by Public Law 104-121.
>
> (Tr. 259) (emphasis added.)

The undersigned notes the Appeals Council's apparently interchangeable use of the terms "opiate dependence" and "opiate drug use." However, the status of being dependent upon opiates, without evidence of ongoing use, does not support a finding that drug addiction was material to any finding of disability.

Again, as noted above, while the record indicates that plaintiff used heroin on one occasion predating his protective filing date, the record does not support the conclusion that plaintiff continued to use heroin. When seen for medical treatment, plaintiff consistently reported that he was not using heroin, and none of his doctors indicated any suspicions to the contrary. While the record contains overwhelming evidence supporting the conclusion that plaintiff was not credible, a finding that plaintiff does not challenge, the Appeals Council made no findings regarding whether it believed that plaintiff continued to use heroin. Absent evidence that plaintiff continued to use heroin, his status as a person dependent upon or addicted to opiates cannot be found material to a finding of disability. See Pettit, 218 F.3d at 904 (alcoholism will not be found "material" to the finding of disability if the disability remains after the claimant stops drinking.)

Nor can evidence establishing that plaintiff used Methadone support the Appeals Council's decision that plaintiff's "opiate dependence" and/or "opiate drug use" was material to a finding of disability. As defined above, Methadone is used therapeutically to ease the symptoms of heroin addiction and to help control an individual's craving for heroin. Evidence that plaintiff used a therapeutic drug to rid himself of a harmful addiction should not be considered as evidence that his drug addiction was material to any finding of disability. See

Hildebrand v. Barnhart, 302 F.3d 836, 838-39 (8th Cir. 2002).  In Hildebrand, the evidence documented that the claimant was a recovering heroin addict who used Methadone to control the symptoms of her heroin addiction.  Id.  Considering reports that the claimant had not been "drug free," the ALJ found that her drug abuse was material to a finding of disability.  Id.  In reversing and remanding the case, the Eighth Circuit noted error in the ALJ's failure to determine exactly what being "drug free" meant.  Id. at 839.  The Eighth Circuit wrote that this determination was of "particular import in light of Hildebrand's numerous prescription medications and her reliance on methadone to control the physical effects of her heroin addiction."  Id.  This decision suggests that evidence that a claimant used Methadone therapeutically cannot support the Commissioner's finding that "opiate drug use" was material to a finding of disability.

In sum, neither proof that plaintiff was "opiate dependent" nor proof that he used Methadone is sufficient to support the Commissioner's finding that plaintiff's "opiate dependence" or "opiate drug use" was material to a finding of disability.  Even though the medical evidence documents that plaintiff exhibited symptoms of depression in the absence of documented heroin use, the undersigned is not suggesting that this record contains substantial evidence supporting a finding of disability due to depression.  In fact, the undersigned notes several factors detracting from such a conclusion, including the

absence of psychiatric hospitalization; the lack of compliance with medical treatment; evidence that plaintiff's symptoms improved with medication; evidence that plaintiff moved to and lived in another state for a significant period of time; and evidence that plaintiff's motivation for confining himself to his room was to avoid the police.

On remand, the Commissioner should consider plaintiff's testimony regarding his heroin use, and analyze the record to determine whether it supports the conclusion that plaintiff continued to use heroin. If plaintiff's testimony that he stopped using heroin is believed, the pertinent inquiry then is whether his depression rendered him disabled after he stopped.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **REVERSED** and this case is **REMANDED** to the Commissioner for proceedings consistent with this opinion.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of March, 2009.